IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOYCE A. BAKER,

            Plaintiff,

    vs.                       Civil Action 2:11-CV-1030
                                 Judge Smith
                                 Magistrate Judge King

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

## REPORT AND RECOMMENDATION

### I.    Background and Medical Evidence

This is an action instituted under the provisions of 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security denying plaintiff's application for disability insurance benefits. This matter is now before the Court on plaintiff's *Statement of Errors*, Doc. No. 13, and on the Commissioner's *Memorandum in Opposition*, Doc. No. 16.

Plaintiff Joyce A. Baker filed her current application for benefits on May 16, 2007, alleging that she has been disabled since March 1, 2006. The application was denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law judge.

An administrative hearing was held on October 7, 2009, at which plaintiff, represented by counsel, appeared and testified, as did Darryl R. Cherdron, M.D., who testified as a medical expert, and Lynne M. Kaufman, M.S., who testified as a vocational expert. *PAGEID* 56.

In a decision dated December 22, 2009, the administrative law judge found that plaintiff "was not under a disability within the meaning of the Social Security Act from March 1, 2006 through the date last insured." *Id*. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on September 16, 2011. *PAGEID* 46-49.

Plaintiff was 51 years of age on the date the administrate law judge issued his administrative decision. *See PAGEID* 217. Plaintiff has a tenth grade education and prior relevant work experience as a sales clerk. *PAGEID* 223, 230. Plaintiff was last insured for disability insurance purposes on June 30, 2006. *PAGEID* 56. Plaintiff has not been employed since March 2006, when she quit work as a cashier. *PAGEID* 98-101.

**A. Plaintiff's Testimony**

Plaintiff testified at the administrative hearing that she has been unable to work since prior to the lapse of her insured status on June 30, 2006 due to severe headaches, right wrist carpal tunnel syndrome, leg difficulties due to swelling and a torn ligament, and back pain. *PAGEID* 102-03. In 2006, plaintiff testified, she was unable to sit for long periods of time and missed two or three weeks of work at a time because of her impairments. *PAGEID* 103-04.

Plaintiff testified that, during the relevant period, she was able to wash laundry and cook, but she could not pick up heavy pots and pans because of problems with her hand and right wrist. *PAGEID* 105. Plaintiff declined to undergo a carpal tunnel release procedure

2

on her right wrist because she was not satisfied with the 1990 procedure on her left wrist. *PAGEID* 106, 113.  Her left hand "still goes to sleep." *PAGEID* 113.

In 2006, plaintiff needed her husband's help to get out of bed in the mornings because she was "stiff;" she needed a cup of coffee and medication to "start moving." *PAGEID* 107.

Plaintiff testified that she missed work because of headaches and pain in her back and legs. *PAGEID* 111.  At the time she quit work in March 2006, plaintiff experienced headaches "almost every day;" she took pain killers and had to lie down in a dark room. *PAGEID* 112. Because of her right carpel tunnel syndrome, she could not write, open cash drawers, or perform other duties associated with her job as a sales clerk. *PAGEID* 112-13.  Lupus and a compromised immune system also caused her to miss work. *PAGEID* 114.  Low energy required her to lie down throughout the day. *PAGEID* 115.  Plaintiff testified that her knee would buckle and cause her to fall. Headaches caused her to blackout for two to three minutes at a time. *PAGEID* 116-17.  It was pain in her back, shoulder, hips and legs that bothered her the most. *Id*.

**B. The Medical Evidence**

Plaintiff was evaluated on April 13, 2000, by David Stainbrook, Jr., D.O., a rheumatologist, for possible collagen vascular disease. *PAGEID* 350.  Plaintiff reported morning stiffness, variable energy, occasional blurred vision, migraine headaches, decreased hearing, and a prior carpal tunnel release on her left wrist.  *Id*. On May 9, 2000,

Dr. Stainbrook diagnosed systemic lupus erythematosus characterized by positive ANA, positive anti-histone antibody, positive C-reactive protein and arthritis; bilateral sensory neural hearing loss; a history of positive PPD (progressive pseudorheumatoid, *i.e.* tuberculosis); and mild osteoarthritis of the knees. *PAGEID* 349. He prescribed Celebrex and corticosteroids. *Id.* In September 2000, Dr. Stainbrook prescribed Plaquenil for plaintiff's inflammatory joint disease. *PAGEID* 346. Plaintiff continued to treat with Dr. Stainbrook through October 2001. *PAGEID* 341.

Barbra Murrell, M.D., was plaintiff's primary care physician from October 2002 through May 2007, *PAGEID* 383-427, and treated plaintiff for chronic and severe headaches, numbness in her hands and wrist, sinus and coughing issues, and urinary problems. *Id.* A February 2004 EMG was consistent with carpel tunnel syndrome on the right; no definite abnormalities were detected on the left. *PAGEID* 415. An x-ray of the cervical spine showed mild degenerative disc disease at C4-5. *PAGEID* 416. A June 2004 x-ray of the lumbar spine showed mild anterior spurring at all levels. *PAGEID* 414.

On March 17, 2004, and on referral by Dr. Murrell, plaintiff's right wrist was evaluated by Dwight Engdahl, M.D., an orthopedic surgeon. Dr. Engdahl diagnosed right carpel tunnel syndrome and fitted plaintiff with a carpal tunnel splint. *PAGEID* 370.

Plaintiff presented to the emergency room at Marietta Memorial Hospital on April 5, 2006, complaining of headache and neck pain. *PAGEID* 362-66. She reported chronic headaches and some vomiting. *Id.*

4

Upon physical examination, plaintiff's neck was supple and there was full strength in her extremities. *Id*. The emergency room physician assessed a muscle contraction headache, which improved with medication. *Id.*

An April 2006 CT scan of the abdomen and pelvis, following complaints of left flank pain with hematuria, revealed no abnormal calcification within the right or left kidneys; there was no evidence of hydronephrosis or hydroureter. *PAGEID* 360-61.

As noted *supra*, plaintiff's insured status lapsed on June 30, 2006.

On November 17, 2006, plaintiff presented to Lowell Body, M.D., an orthopedic surgeon, complaining of right knee pain which she attributed to a motor vehicle accident three years earlier. *PAGEID* 371. She complained of a grinding sensation and a feeling that the knee is unstable or unsteady; she had fallen a couple times, and experienced intermittent swelling of her entire leg. *Id*. On examination, Dr. Body noted no swelling, a full range of motion, good ligamentous stability to varus, and valgus stress. *Id*. Dr. Body also noted a negative Lachman's test, equivocal McMurray's test, medial joint line tenderness, and some crepitus on patellar compression. *Id.* X-rays of the knee showed very mild degenerative changes with some bone spur formation at the margins, but no significant osteoarthritis. *Id*.

A November 2006 MRI of the right knee revealed a cleavage tear of the anterior horn lateral meniscus; focal chondral defect of the

lateral femoral condyle; grade II patellar chondromalacia; and medial
collateral ligament sprain. *PAGEID* 493-94. Dr. Body recommended the
initial use of Tylenol and suggested surgery if she had more
significant problems. *PAGEID* 372.

Plaintiff began treating with William Shade, M.D., on August 3,
2006. *PAGEID* 428-29. On physical examination, Dr. Shade noted that
plaintiff was able to walk under her own power, was in no acute
distress, and did not appear acutely ill. *Id*. Plaintiff's neck was
supple with a full range of motion; she had no pitting edema in her
extremities. *Id*. In a September 7, 2006 follow-up, plaintiff
reported no further wheezing episodes or chest pain, unusual shortness
of breath, nausea, vomiting, diarrhea, or fever. *PAGEID* 430. In
November 2006, plaintiff complained of daily headaches for the prior
"couple weeks." *PAGEID* 431.

Plaintiff was seen by Dwight Engdahl, M.D., in February 2007 for
intermittent pain in the right buttock and posterior thigh over the
prior several months. *PAGEID* 379-80. On clinical examination, Dr.
Engdahl found "minimal greater trochanteric tenderness, mild
tenderness in the base of the LS spine and sciatic notch. Mild
straight leg raise today. No pain with flexion, rotation of her hip.
Negative Stinchfield sign. Normal neurological and vascular exam."
*Id*. Dr. Engdahl diagnosed degenerative joint disease of the lumbar
spine with right sciatica. *Id*. An MRI showed a large cyst in the
distal sacrum in the central canal, possibly a sacral meningocele
arachnoid cyst, and some degenerative disc changes in L1-2 and 4-5.

6

*Id.*  Dr. Engdahl noted that he was unsure whether the cyst had any bearing on her symptoms, so he referred plaintiff to a neurosurgeon. *Id.*

In April 2007, a state agency physician, W. Jerry McCloud, M.D., reviewed the record and opined that plaintiff had the residual functional capacity to lift and/or carry up to fifty pounds occasionally and twenty-five pounds frequently, stand/walk for six hours in an eight hour day, and sit for six hours in an eight hour day.  *PAGEID* 453-54.  Dr. McCloud also found no postural limitations, but concluded that plaintiff would be limited to only occasional overhead reaching on the left.  *PAGEID* 455-56.  Plaintiff should also avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.  *PAGEID* 457.

In June 2007, plaintiff reported to Dr. Shade that she had discontinued the use of an Albuterol inhaler because it caused severe headaches. *PAGEID* 438.

On July 5, 2007, plaintiff was treated by Fred Branditz, M.D., a pulmonologist, upon referral from Dr. Shade for complaints of increased dyspnea.  *PAGEID* 464.  Dr. Branditz diagnosed chronic asthmatic bronchitis and COPD secondary to cigarette smoking.  *PAGEID* 464-68. Dr. Branditz started plaintiff on inhalers and encouraged her to stop smoking.  *Id.*  Follow-up treatment notes indicated improvement. *PAGEID* 510-13.

A January 2008 MRI of the lumbar spine showed a focal disc herniation on the right at L5-S1, causing significant impingement upon

7

the S1 nerve root, which the radiologist determined was the likely cause of plaintiff's right sided symptomatology.  *PAGEID* 474-75.

Plaintiff was evaluated by Albert Camma, M.D., a neurosurgeon, on February 6, 2008. *PAGEID* 478-80. On March 25, 2008, Dr. Camma performed a microsurgical discectomy on the right side at L5-S1 to address plaintiff's low back and right lower extremity pain.  *PAGEID* 480-83, 505-08.  Dr. Camma reported that plaintiff did well after the procedure and reported only some low back pain at times, particularly toward the end of the day.  *PAGEID* 476.

In December 2008, Dr. Shade rendered an assessment of plaintiff's functional capacity but expressly declined to render an opinion regarding plaintiff's impairments and their impact on her ability to engage in work-related activities prior to August 2006, when his treatment of plaintiff began. *PAGEID* 484("Please be aware, we did not see this individual until August 3, 2006 so I'm not able to comment on issues before that time.") According to Dr. Shade, plaintiff is able to stand/walk for two hours in an eight hour day and sit for eight hours in an eight hour day. *PAGEID* 485.  Plaintiff could lift up to ten pounds, but had limitations in her hands with pushing and pulling and fine manipulation.  *Id*.  He opined that plaintiff was able to finger occasionally, but was able to handle, reach, and feel constantly.  *PAGEID* 487.  Dr. Shade determined that plaintiff had almost no limitations in her mental ability to do work-related activities, but that she could not sustain full-time work activity. *PAGEID* 486, 489-92.

8

In April 2009, plaintiff reported to Dr. Shade that she had a history of migraine headaches and experienced two to three episodes per month. *PAGEID* 517. In July 2009, plaintiff complained of increasingly severe headaches. *PAGEID* 515. An MRI and CT scan of the brain revealed meningiomas. *PAGEID* 529-31.

Dr. Camma diagnosed a parasagittal tumor with bony invasion. *PAGEID* 502-04. On August 18, 2009, Dr. Camma performed a left frontal craniectomy with tumor resection and reconstructive cranioplasty. *Id*. Plaintiff did "quite well" after the surgery. *PAGEID* 537-38.

Darryl Cherdron, M.D., testified as a medical expert at the administrative hearing. According to Dr. Cherdron, prior to June 30, 2006, the record documented systemic lupus erythematosus, bilateral carpel tunnel syndrome, degenerative disc disease with herniated lumbar disc, and hypertension. *PAGEID* 120-21. However, plaintiff's impairments neither met nor equaled a listed impairment prior to June 30, 2006, although "[t]here is a meeting of a listing after that time period." *PAGEID* 121. Prior to June 2006, plaintiff could not perform fine manipulation with her left hand, could have stood/walked for six hours in an eight-hour day and could have sat for six hours in an eight-hour day. Dr. Cherdron initially testified that "[i]t would have been difficult for her to complete a full eight hour day." *PAGEID* 121. *See also PAGEID* 131-32. He subsequently elaborated on this statement:

> I did not indicate she could not work. . . . [S]he would not have been able to work a full eight hours without taking breaks and changing positions. And it would have been

9

> difficult to I'd say work over seven hours out of the eight
> hour day with the limitations she had at that time with the
> degenerative disc disease.

*PAGEID* 132.

Dr. Cherdron also discussed the August 2009 resection of plaintiff's meningiomas.  According to Dr. Cherdron, meningiomas "are known as very slow growing tumors," that could take years to develop to the point of being incapacitating.  *PAGEID* 122.  According to Dr. Cherdron, plaintiff's headaches in 2006 "could have been related to the meningioma at that time and that would have restricted her concentration and if she was blacking out at the time that would have restricted her ability go [sic] work around machinery and tend to do things like that."  *PAGEID* 122-23.  Dr. Cherdron noted that the record offered no objective corroboration for plaintiff's testimony that she blacked out prior to June 2006.  *PAGEID* 123.  He also indicated that there was "no evidence in the medical record" that the meningioma existed prior to June 2006, although he could not "exclude the possibility that she did have it at the time and it contributed to her headaches."  *PAGEID* 124.

### C. Vocational Testimony

The vocational expert testified that the state agency physician's RFC assessment would not preclude the performance of plaintiff's past relevant work as a sales clerk, *PAGEID* 134, but that the December 2008 assessment of Dr. Shade and the assessment of Dr. Cherdron were inconsistent with full-time work.  *PAGEID* 135.

## II.  Administrative Decision

The administrative law judge found that plaintiff's severe impairments consisted of systemic lupus erythematosus, right carpal tunnel syndrome, a history of left carpal tunnel syndrome and repair, chronic obstructive pulmonary disease (COPD), obesity, tobacco abuse, degenerative disc disease, hypertension, and headaches.  *PAGEID* 58. The administrative law judge found that, through the date that her insured status lapsed, plaintiff retained the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567©. *PAGEID* 62.  Specifically, the administrative law judge found that plaintiff could "lift/carry up to fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for six hours in an eight-hour day and sit for six hours in an eight-hour day." *Id*.  In addition, plaintiff "needed to avoid fumes, odors, dusts, gases, and poor ventilation." *Id*.  Relying on the testimony of the vocational expert, the administrative law judge found that, through the date she was last insured, plaintiff was able to perform her past relevant work as a sales clerk.  *PAGEID* 66.  Accordingly, the administrative law judge concluded that plaintiff was not disabled within the meaning of the Social Security Act at any time from March 1, 2006, her alleged onset date, through June 30, 2006, the date she was last insured. *PAGEID* 66-67.

## III. Discussion

Pursuant to 42 U.S.C. § 405(g), judicial review of the Commissioner's decision is limited to determining whether the findings

of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971); *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).  Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Buxton v. Haler*, 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility.  *See Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk*, 667 F.2d at 536.  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion.  *Longworth,* 402 F.3d at 595.

In her *Statement of Errors*, plaintiff contends that the administrative law judge erred by failing to give Dr. Shade's opinion controlling weight, by rejecting the opinion of Dr. Cherdron, and by failing to incorporate plaintiff's upper extremity limitations in his residual functional capacity ("RFC") assessment.

12

A.    Evaluation of Dr. Shade's Opinion

Plaintiff maintains that the administrative law judge erred in failed to give controlling weight to the opinion of her treating physician, Dr. Shade.  *Statement of Errors*, p. 13.  The opinion of a treating provider must be given controlling weight if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  Even if the opinion of a treating provider is not entitled to controlling weight, an administrative law judge is nevertheless required to determine how much weight the opinion is entitled to by considering such factors as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the extent to which the opinion is supported by the evidence, and the consistency of the opinion with the record as a whole.  20 C.F.R. § 404.1527(c)(2)-(6); *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Moreover, an administrative law judge must provide "good reasons" for discounting the opinion of a treating provider, *i.e.,* reasons that are "'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5).  This special treatment afforded to the opinions of

13

treating providers recognizes that

> "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."

*Wilson,* 378 F.3d at 544 (quoting 20 C.F.R. § 404.1527(d)(2)).

In December 2008, Dr. Shade opined that plaintiff could stand/walk for two hours in an eight hour day and sit for eight hours in an eight hour day. *PAGEID* 485. Plaintiff could lift up to ten pounds, but was limited in her ability to push and pull and to engage in fine manipulation. *Id*. Specifically, Dr. Shade opined that plaintiff could finger occasionally, but was able to handle, reach, and feel constantly. *PAGEID* 487. According to Dr. Shade, plaintiff could not sustain full-time work activity. *PAGEID* 486, 489-92. The administrative law judge recognized Dr. Shade as a treating physician, but did not afford his December 2008 opinion any weight in determining plaintiff's residual functional capacity assessment prior to the lapse of her insured status in June 2006. *PAGEID* 63.

The administrative law judge's analysis of Dr. Shade's opinion does not violate the treating physician rule. The administrative law judge provided specific reasons for assigning no weight to Dr. Shade's opinion:

> First, it is noted that Dr. Shade started treating the claimant in August 2006 which is after her date last insured. He even admitted that he was unable to comment on issues prior to August 2006. Further, it appears that Dr. Shade based his opinion on the claimant's subjective

14

complaints, which have not been found to be fully credible. For instance, he stated that the claimant "reported" that long-term sitting and standing hurt her back.  Dr. Shade's treatment notes also do not support his findings as he generally found her to not appear in distress, to have no edema, and to have no focal motor loss.

*PAGEID* 63.  Although the administrative law judge's analysis is succinct, it is sufficiently specific as to the weight given to Dr. Shade's medical opinion and the reasons for assigning that weight. Under the circumstances, a formulaic recitation of factors is not required.  *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) ("If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

Further, the administrative law judge's reasons for assigning no weight to Dr. Shade's opinion are supported by substantial evidence. Significantly, Dr. Shade offered no opinion whatsoever on plaintiff's condition prior to June 30, 2006.  *See* PAGEID 484.  Moreover, Dr. Shade's August 3, 2006 treatment notes do not support a conclusion that plaintiff could not sustain full-time work.  *See PAGEID* 428-29 (noting that plaintiff was able to walk under her own power, was under no acute distress, did not appear acutely ill, had a supple neck with a full range of motion,  and no pitting edema in her extremities).

It is well-settled that the Commissioner's decision, when supported by substantial evidence, must be affirmed even if the plaintiff's position is also supported by substantial evidence.  *See*

15

*Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007).
Because the administrative law judge correctly applied the standards
of the treating physician rule to his determination of Dr. Shade's
opinion, and because substantial evidence supports his findings, the
Court finds no error with the Commissioner's decision in this regard.

**B.    Evaluation of Dr. Cherdron's Opinion**

Plaintiff also contends that the administrative law judge
"improperly rejected the opinion of Dr. Cherdron that, before her date
last insured, Plaintiff was unable to sustain full time work activity,
and that her chronic headaches may have been caused by the as yet
undiagnosed meningiomas." *Plaintiff's Statement of Errors*, p. 10.
According to plaintiff, Dr. Cherdron's testimony is "entitled to
controlling weight," and "[w]hether Plaintiff's meningiomas were
causing her headaches prior to her date last insured must be
inferred." *Id.* at 11.

The opinions of only treating sources are entitled to controlling
weight. A treating source is a "medical source who provides you, or
has provided you, with medical treatment or evaluation and who has, or
has had, an ongoing treatment relationship with you." 20 C.F.R. §
416.902.  Dr. Cherdron testified at the administrative hearing as a
medical expert, *see PAGEID* 118, and there is no suggestion that he
ever treated plaintiff.  Dr. Cherdron is therefore not a "treating
source," and his opinion is not entitled to "controlling weight." *See*
20 C.F.R. § 404.1527©; *Boucher v. Apfel*, 238 F.3d 419, 2000 WL
1769520, at *9 (6th Cir. Nov. 15, 2000) (finding that a doctor did not

16

qualify as a treating source and did not have an ongoing treatment relationship with the claimant even though the doctor had examined claimant three times over a two-year period).

Plaintiff also contends that the administrative law judge erred in evaluating Dr. Cherdron's testimony, and that "[w]hether plaintiff's meningiomas were causing her headaches prior to her date last insured must be inferred, given the lack of strong objective evidence dating to that period." *Statement of Errors*, p. 11. Dr. Cherdron testified that plaintiff's headaches in 2006 "could have been related to the meningioma at that time and that would have restricted her concentration and if she was blacking out at the time that would have restricted her ability go [sic] work around machinery and tend to do things like that." *PAGEID* 122-23. However, Dr. Cherdron commented that plaintiff's testimony regarding black outs was not documented in the objective evidence. *PAGEID* 123. He also commented that there was "no evidence in the medical record" that plaintiff had meningiomas prior to June 2006, but that he could not "exclude the possibility that she did have it at the time and it contributed to her headaches." *PAGEID* 124.

The administrative law judge observed plaintiff's history of migraine headaches and included that condition among plaintiff's severe impairments. *PAGEID* 58-59. However, in evaluating the limiting effects of plaintiff's headaches, the administrative law judge discounted Dr. Cherdron's testimony as "inconsistent with the record as a whole;" the administrative law judge determined that there

was a dearth of evidence during the relevant time period to support a limitation of function based on headaches.  *PAGEID* 62-63.

The record demonstrates that plaintiff suffered from headaches prior to her date last insured, but does not indicate the severity of plaintiff's headaches or suggest that they limited her functionality in any way.  *See PAGEID* 395 (January 2005), 404 (April 2005), 357 (April 2006).  Plaintiff was treated in April 2006 for a "muscle contraction headache," but the headache improved with medication. *PAGEID* 362-63.  Although plaintiff testified that she was experiencing black outs, *see PAGEID* 116-17, the administrative law judge found that plaintiff's testimony was not credible.  PAGEID 64-66.  Notably, plaintiff does not suggest that the administrative law judge erred in this credibility determination.

It is possible – as Dr. Cherdron speculated – that plaintiff's meningiomas existed prior to the date on which she was last insured and that the meningiomas caused plaintiff's headaches during that period.  Nevertheless, the mere existence of meningiomas and the fact that plaintiff experienced headaches during that period do not, by themselves, require a conclusion that plaintiff experienced resulting work limitations.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis of arthritis, of course, says nothing about the severity of the condition.") (citing *Foster v. Brown*, 853 F.2d 483, 489 (6th Cir. 1988)).

In short, the Court concludes that the administrative law judge did not err in his evaluation of Dr. Cherdron's opinion.

## C.    The Administrative Law Judge's RFC Assessment

Plaintiff argues that the administrative law judge failed to properly incorporate a limitation on plaintiff's use of her upper extremities in his RFC assessment. *Statement of Errors*, p. 12.  An RFC determination is an indication of an individual's work-related abilities despite their limitations.  *See* 20 C.F.R. § 404.1545(a). The RFC is an administrative finding of fact reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d)(2), (3); *Edwards v. Comm'r of Soc. Sec.*, 97 F. App'x 567, 569 (6th Cir. 2004).  It represents the most, not the least, a claimant can do despite her impairments.  20 C.F.R. §§ 404.1545(a); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).  In assessing a claimant's RFC, an administrative law judge must consider all relevant record evidence, including medical source opinions on the severity of a claimant's impairments.  *See* 20 C.F.R. §§ 404.1527(d), 404.1545(a).  Furthermore, courts have stressed the importance of medical opinions to support a claimant's RFC, and cautioned administrative law judges against relying on their own expertise in drawing RFC conclusions from raw medical data.  *See Isaacs v. Astrue*, No. 1:08-CV-828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) (quoting *Deskin v. Comm'r Soc. Sec.*, 605 F.Supp.2d 908, 912 (N.D. Ohio 2008)).

In the case presently before the Court, the administrative law judge found that, through the date plaintiff was last insured, she had the RFC to perform medium work.  *PAGEID* 62.  The administrative law judge specifically found that plaintiff was able to lift/carry up to

fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for six hours in an eight-hour day and sit for six hours in an eight-hour day.  *Id*.  In addition, plaintiff should avoid fumes, odors, dusts, gases, and poor ventilation.  *Id*.  In making this RFC assessment, the administrative law judge expressly adopted the opinion of W. Jerry McCloud, M.D., a state agency physician, and declined to accept the opinions of Dr. Shade and Dr. Cherdron.  *PAGEID* 62-63.

Dr. Shade opined that plaintiff could not push or pull or engage in fine manipulation.  *Page ID#* 485.  As discussed *supra*, however, Dr. Shade expressly limited his opinion to the period after plaintiff's insured status lapsed.  *See PAGEID* 484.

Dr. Cherdron opined that, prior to June 2006, plaintiff "would have had limitations in the use of the left hand and she probably could not have done fine manipulation with that."  *PAGEID* 121-128. Plaintiff has a history of carpel tunnel syndrome, *see PAGEID* 370, but an EMG in February 2004 did not detect "any definite abnormalities" in her left wrist.  *PAGEID* 415.  Right carpal tunnel syndrome was diagnosed in 2004, *PAGEID* 370, but Dr. Cherdron did not suggest that plaintiff was limited in the use of her right hand.  *PAGEID* 121-128. In any event, plaintiff continued to work – even with this condition – through March 2006, *see PAGEID* 98-101, and there is no evidence in the record that plaintiff's carpal tunnel syndrome became worse or that she sought treatment for the condition after March 2006.  In short, the administrative law judge's decision enjoys substantial support in the record.

20

Having carefully considered the entire record in this action, the Court concludes that the decision of the Commissioner is supported by substantial evidence. It is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that this action be **DISMISSED**.

If any party seeks review by the District Judge of this *Report and Recommendation,* that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation,* specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *Smith v. Detroit Federation of Teachers, Local 231 etc.,* 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).


January 25, 2013                    <u>s/ Norah McCann King</u>
                                    Norah McCann King
                                    United States Magistrate Judge